ABOY, VIDAL & CO., DEMANDANTES Y APELANTES, *v.* EL PUEBLO DE PUERTO RICO, DEMANDADO Y APELADO.

APELACIÓN procedente de la Corte de Distrito de San Juan, Sección 1ª., en un caso de indemnización de daños y perjuicios.

No. 1149.—Resuelto en julio 30, 1914.

DESTRUCCIÓN DE PROPIEDAD POR EL SERVICIO DE SANIDAD—PESTE BUBÓNICA.— Examinada la prueba presentada y atendidas las circunstancias de este caso, se resolvió: que las casas descritas en la demanda, que fueron destruídas por el servicio de sanidad con motivo de la peste bubónica que existió en Puerto Rico, eran viejas, ruinosas, poco susceptibles de ser arregladas, parte de las mismas unida a la tierra, los techos llenos de goteras, paredes carcomidas y pisos podridos e infectados de ratones y otras sabandijas, y que la orden del Director de Sanidad para destruir dichas casas fué justa, legal y necesaria teniendo en cuenta la situación con motivo de la epidemia de la peste bubónica.

Los hechos están expresados en la opinión.

Abogado de los apelantes: *Sr. Frank Antonsanti.*

Abogado del Pueblo: *Sr. Charles E. Foote, Fiscal.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

Esta acción fué establecida de conformidad con el artículo 32 de la ley titulada "Ley para reorganizar el servicio de Sanidad," aprobada en marzo 14, 1912, que en parte dice lo siguiente:

"Artículo 32.—Toda persona cuya propiedad haya sido injusta o ilegalmente destruída o dañada por obligar a la observancia de

alguna orden, reglamento, ordenanza o por acto alguno ejecutado por el Servicio de Sanidad o por sus empleados o agentes exentos de responsabilidad personal, podrá sostener la acción correspondiente contra el Gobierno de Puerto Rico para recobrar los daños y perjuicios consiguientes;   *   *   *."

No se ha promovido cuestión alguna relativa a la facultad del Director de Sanidad para ordenar la destrucción de la propiedad, por cuya pérdida se trata ahora de recobrar daños y perjuicios, si dicha destrucción era en realidad necesaria en la fecha de la referida orden como medida urgente en época de epidemia para hacer desaparecer un perjuicio público y eliminar una verdadera amenaza para la salud pública. Verdaderamente que la única cuestión que ha sido sometida a nuestra consideración, según aparece del alegato del apelante y fué admitido durante la vista del caso, es si considerada toda la prueba presentada de acuerdo con las alegaciones tenía o nó derecho el demandante a que se dictara una sentencia a su favor por los daños y perjuicios sufridos por haber probado que no existía en realidad ningún estorbo público, o que de haber existido debió haber procedido a la extinción del mismo por medios menos violentos, y por tanto que hubo abuso de discreción en el ejercicio de facultades cuasi judiciales por parte del Director de Sanidad al ordenar arbitraria e innecesariamente, y por consiguiente injusta e ilegalmente que se destruyera la propiedad del demandante; o para expresar la cuestión precisa más suscintamente, si los edificios destruídos se encontraban o nó realmente en tal condición que apreciadas todas las circunstancias estuvieran justificadas las medidas extremas como las que tomó el Director de Sanidad.

La corte inferior después de haber negado una moción de sobreseimiento y de oir toda la prueba, resolvió en definitiva que debió haberse declarado con lugar la expresada moción, declarando además, que si bien la prueba de la defensa no fué enteramente satisfactoria, el caso del demandante no había quedado suficientemente robustecido por la

misma para destruir la presunción legal que existe en favor de la regularidad y propiedad de la acción oficial en cuestión y desestimó la demanda.

Según la opinión que tenemos del caso después de haber examinado cuidadosamente los autos, las diferentes cuestiones relativas al valor que debe propiamente darse a tales presunciones legales y hasta qué extremo pudieron haber influído éstas en la corte inferior y deben influir en este tribunal al considerar la prueba, no son de importancia vital y en realidad pueden ser eliminadas de nuestra consideración para los fines de esta opinión.

Una simple exposición de la prueba presentada durante el juicio creemos que será suficiente sin más discusión para mostrar con bastante claridad que la acción expedita de las autoridades de sanidad, luchando como estaban entonces con el problema no menos serio de tener que combatir y extinguir la epidemia de la peste bubónica, y teniendo que ver como tenían que hacerlo con los edificios de la clase a que hicieron referencia los testigos tanto del demandante como del demandado situados dentro de la localidad que fué primera y más seriamente atacada por la infección de la temible epidemia, no solamente fué justa y legal sino altamente digna de elogios y muy laudable. Sin embargo, atendida la naturaleza e importancia de la cuestión envuelta en este caso se hace necesario que hagamos referencia a los hechos que aparecen de los autos con más extensión que de ordinario.

Haciendo caso omiso de todo aquello que se refiera a valores, cálculos relativos a los daños y perjuicios ocasionados y a otras cuestiones que son inmateriales para la cuestión principal, tanto las alegaciones como la prueba puede compendiarse en la forma siguiente:

Alega la demanda que el demandante en 28 de julio de 1912, y anteriormente a esta fecha, era dueño de las casas marcadas con los números 21 y 23 respectivamente, de la calle de San Agustín, Puerta de Tierra, barrio del municipio de San Juan; que en 25 de julio de 1912, el demandante

fué notificado por el Director de Sanidad de que era necesario destruir dichas casas haciendo desaparecer las maderas que las constituían dentro del plazo de dos días contados desde dicha fecha, por constituir un peligro para la salud pública; que en virtud de dicha notificación dichas dos casas fueron destruídas haciendo desaparecer las maderas que las constituían; que dos meses antes de la orden a que se ha hecho mención anteriormente, el demandante fué obligado por otra orden anterior del Departamento de Sanidad a gastar la suma de $500 en reparaciones de las mismas casas y que éstas estaban en buen estado de conservación, siendo ilegal e injusta su destrucción.

El demandado después de hacer las admisiones y negaciones ordinarias, alegó en su contestación que las casas descritas en la demanda estaban en completo estado de ruina, estando completamente podridas las maderas y todos los materiales que las componían y que en el mes de julio, 1912, constituían un estorbo público que amenazaba la salud de la comunidad; que en junio, 1912, se declaró oficialmente la existencia de la peste bubónica en la Isla de Puerto Rico y especialmente en la ciudad de San Juan y sus barrios y el Departamento de Sanidad comenzó la labor de exterminar las ratas por ser éstas el medio conductor de la peste; que durante los meses de junio, julio y agosto de dicho año, era el barrio de Puerta de Tierra y sobre todo de la parada 2½ a la 3½, la zona en que precisamente estaban radicadas las casas en cuestión, el sitio donde existían y se encontraban mayor número de ratas y en donde mayor número de personas pasaban y pasaron a ser víctimas de la referida enfermedad, habiéndose registrado entre junio 1 a agosto 28 de dicho año, veinte y cuatro casos de peste, demostrando esto la existencia de gran número de ratas infectadas con el bacilo de la peste búbonica por toda aquella localidad; que las casas números 21 y 23 a que hace referencia la demanda estaban radicadas en la calle de San Agustín, parada 3½, Puerta de Tierra, y que en estas casas en el mes de junio como en el de

julio, se encontraban y encontraron gran número de ratas
y que en el mes de julio dichas casas fueron desocupadas, no
solamente por la existencia de gran número de ratas que
tenían su albergue en las mismas, sino porque estaban en
tan malas condiciones sanitarias, pues estaban completamente
podridas, que era imposible que en ella vivieran seres huma-
nos; que en los meses de junio y julio los empleados de Servi-
cio de Sanidad pasaron una visita de inspección a estas casas,
resultando que dichos edificios no estaban en condiciones sani-
tarias y violaban las disposiciones de la ley de Sanidad y los
reglamentos sobre la materia constituyendo un estorbo público
y una amenaza para la salud de aquel vecindario; que dichas
casas eran de maderas y techadas de zinc, con pisos también
de maderas; que fueron de las primeras que se construyeron
en el barrio de Puerta de Tierra, y tanto los setos como los
pisos estaban completamente podridos, los primeros no ajus-
taban ni al techo ni a los pisos debido al estado de podre-
dumbre de la maderas; que había grandes vacíos entre las
junturas de los setos con los pisos, vacíos por los cuales tenían
las ratas libre acceso al interior de dichas casas, y los techos
se encontraban corroídos por la acción del tiempo; que los
pisos de las dos casas estaban formados por tablas podridas
pegados a la tierra sin defensa alguna y casi todas las tablas
estaban levantadas y rotas; que debido al estado ruinoso
de las dos casas de referencia los pisos estaban llenos de cue-
vas de ratas y debajo de los mismos o sea en la tierra debajo
de dichos pisos se encontraban en 25 de julio, 1912, y antes
de esa fecha, matrigueras y nidos de ratas cuyo número es
imposible precisar; que como los setos no se ajustaban a
los pisos quedaban hoyos allí en donde debían ajustar y esos
hoyos servían de sitio y albergue para las ratas; que era tal
el estado de ruina de dichas dos casas, que las mismas ame-
nazaban caerse y todo el maderaje que las componía estaba
mugriento y podrido; que durante los meses de junio y julio,
1912, empleados del Departamento de Sanidad encontraron
en dichas casas, tanto en la una como en la otra, gran número

de ratas, y entre ellas, a fines de julio una que estaba infectada con el bacilo de la peste bubónica; que debido a que estas casas estaban en tan malas condiciones sanitarias por estar llenas de cuevas de ratas y ser un albergue seguro para las mismas, el Director de Sanidad con fecha de 25 de julio de 1912, expidió una orden dirigida al demandante para que abatiera ese estorbo público, habiéndose registrado en el barrio de Puerta de Tierra y entre el 1 de junio a 28 de agosto, veinte y cuatro casos de peste entre los seres humanos, entre ellos tres entres los días 22 de junio y 3 de julio en la parada 3½, en donde estaban radicadas las casas, y 7 casos más entre las paradas 2½ y 3 entre los meses de junio y julio; que las referidas casas constituían un estorbo público y una seria amenaza para la salud pública y que la orden contra la cual se queja el demandante no solamente fué justa, legal y necesaria de acuerdo con la ley y en vista de las circunstancias del caso, sino el único medio de abatir el estorbo público y alejar el peligro que amenazaba a la comunidad.

Teodoro Vidal, declara que en el mes de julio las casas en cuestión que eran dos ranchones alquilados en parte a inquilinos pero siempre con una tienda en la esquina estaban bastante viejos pero habitables y casi siempre estaban ocupados; que dichos ranchones estaban construídos de madera y techados de zinc y sus pisos estaban buenos en unos sitios y en otros no; que no puede decir en qué condiciones estaban los pisos malos pero que el piso no estaba completamente podrido, si bien algunas partes pudieran haber estado podridas; que la estimación del valor de los ranchones la hace por las maderas y el zinc que había allí; que los edificios (ranchones) estaban bastante habitables y que en el chiquito había una fonda, pero como la Sanidad exigía piso de material lavadero, etc., se quitó la fonda y entonces se usó dicho ranchón como depósito de maderas; que no recuerda si el piso estaba levantado o pegado de la tierra; que los estantes pudieron ser utilizados para otra cosa, pero no puede decir si las tablas

que se quemaron por orden de la sanidad podrían haber sido utilizadas.

José Morán, declara que por un período de unos dos años con anterioridad al comienzo de la peste bubónica, si bien no puede recordar cuánto tiempo antes, el testigo había alquilado a los demandantes las tres puertas del ranchón con frente a la calle de San Agustín, por lo que pagaba cuarenta dólares mensuales.

Luciano Lanclos, declara que por dos o tres años fué administrador de los ranchones números 21 y 23 de la calle de San Agustín habiéndolos reparado durante esa época especialmente en el local ocupado por la tienda y en el techo; que algunos meses antes de la peste bubónica dejó de administrar dichos ranchones; que éstos habían estado dedicados a vivienda, fonda y tienda; que durante los tres años de su administración los ranchones estuvieron siempre ocupados, pues salía un inquilino y entraba otro; que poco antes de la peste bubónica hicieron el piso de atrás nuevo y lo levantaron nuevo y el costado bajando a la San Antonio Dock Company lo taparon con concreto y pusieron el techo de zinc galvanizado entre la tienda y el depósito de leche; que dicho puesto de leche pertenecía a Infanzón y García y había estado ocupado hasta un poco antes de cogerlo Aboy y Vidal; que tenía un peón al cual pagaba tres dólares y le daban una habitación para que se ocupara de limpiar los corrales y de coger goteras; que las reparaciones se hacían regularmente; que la tienda pudo haber durado cuatro o cinco años, pues tenía zinc nuevo y lo había pintado y la fonda arreglándole el piso podía durar indefinidamente; que cesó como administrador de los ranchones como cuatro o cinco meses antes de la peste bubónica; que cuando cesó ya no estaba allí el depósito de leche; que el resto de los ranchones según había un roto en el piso lo tapaban y sacaban tablas y la renovaban; que los rotos en el piso no eran frecuentes y en el techo no habían goteras hasta pocos meses antes de la peste bubónica.

Juan de la Cruz, declara que como carpintero a menudo arreglaba los pisos de los ranchones y le puso un piso de hormigón a la parte que ocupaba la fonda; que para la época de la peste bubónica trabajaba de carpintero con Aboy, Vidal y que varias veces hizo reparaciones en el ranchón, en la tienda y en la fonda; que a instancias de la Sanidad él compuso los pisos del ranchón varias veces y una vez a la fonda le puso piso de hormigón; que para los arreglos del piso usaba siempre madera machihembrada nueva, que la facilitaban Aboy, Vidal; que a la tienda le puso una vez zinc nuevo, plafón y cielo raso como un año o dos antes de la peste; que el ranchón se dedicaba a vivienda de familia, ventorrillos, tienda, fonda y lechería; que todo estuvo siempre ocupado menos la fonda que la dedicaron a maderas.

José Lucero, quien sustituyó a Luciano Lanclos como administrador, manifiesta que a menudo arreglaba los pisos de los ranchones, que el ranchón No. 21 se dedicaba a vivienda, fonda y tienda, pero la fonda estaba en una casita separada; que la tienda era de José Morán; que·para las reparaciones se usaba pichipén nuevo; que esos ranchones pudieron durar indefinidamente, pues a cada momento se estaba renovando lo malo y poniéndose nuevo; que el ranchón era un ranchón corriente de madera como todos los del barrio, dividido en habitaciones; que no puede recordar las reparaciones que se hicieron a los ranchones porque a cada momento se hacían reparaciones en el piso, que no recuerda que se le cambiaran los setos, pero sí que se le cambiaran los pisos por completo aunque no recuerda la fecha; que cuando los ranchones fueron destruídos los pisos eran casi todos nuevos; que el de la fonda era ya viejo pero no tenía rotos; que las casas estaban regulares y habitables.

*Por el demandado.*—El Dr. W. F. Lippitt, Director de Sanidad, declara que el foco principal de la epidemia estaba en Puerta de Tierra cerca de la parada 2½ hasta la 4 y 5, y por lo general a la parte sur de la calle de San Agustín; que la infección está trasmitida por las ratas, y que por lo tanto la rata es

el primer punto del ataque en la campaña contra la peste; que las ratas por lo general, y especialmente en las tiendas de provisiones se albergan debajo de los pisos que están bajos, en los setos dobles y en los techos de las casas; que en julio de 1912 el testigo ordenó la destrucción de los ranchones pertenecientes al demandante porque servían de albergue de ratas, pues le consta en términos generales que tenían los pisos de madera y muy bajos; que no puede positivamente decir que la casa albergaba ratas, pero que bien podían servir como albergue de ratas; que expidió esta orden porque las casas estaban ruinosas y en su opinión no era posible ponerlas en condiciones que no constituyeran un peligro para la salud, en vista de la epidemia; que su opinión es la de que dichas casas constituían entonces un estorbo público; que se funda para decir que era un estorbo público en las condiciones generales de la casa; que después del 20 de junio hizo una inspección muy general de dichas casas porque ya se le había recomendado la destrucción de las mismas, y por lo tanto no hizo nada más que verlas para ver si era justificada o no la destrucción; que no recuerda la altura de las casas con respecto a la acera frente a la calle de San Agustín, pero que entre la acera y el piso entrando por la calle de San Agustín estaban casi a nivel de la acera, sino más bajo, aunque esto no puede declararlo positivamente; que cree que el terreno en donde estaban edificadas las casas tenía inclinación hacia el sur, aunque no puede precisar la altura que existía entre el piso y las casas y el suelo en la parte de atrás, pues que no estuvo en la parte de atrás más que una o dos veces y no con la idea de fijarse en eso; que toda casa pegada al suelo con piso de madera es un peligro en tiempo de peste; que el testigo nunca hizo para esa época de peste inspecciones detalladas en Puerta de Tierra, sino generales; que cree que estuvo en las casas de Aboy, Vidal, pero no podría jurarlo; que las casas no tenían tres pies sobre el suelo; que por detrás podrían tenerlo, pero no en toda su extensión; que el piso en frente de las casas estaba casi pegado al terreno, pero no

puede decir positivamente que estuviese al nivel de la acera; que entró en el patio de la casa y solamente vió las condiciones generales de la misma; que no puede decir exactamente la distancia que había desde el piso hasta llegar al suelo; que las inspecciones se hacían por los inspectores los que llenaban una tarjeta de información la cual se pasaba a la oficina del Dr. Creel, que estaba entonces encargado especialmente de ese trabajo; que entonces uno de los ingenieros visitaba la casa en compañía del Doctor Creel y resolvían sobre las reformas; que en caso de destrucción se sometía el asunto a mí como director, por ser este un asunto de importancia; que fué a visitar el edificio por virtud de denuncia presentada por los inspectores, pero no puede decir quiénes fueron esos inspectores; que el Doctor Creel estaba encargado de esa clase de trabajos en San Juan, bajo la dirección o consulta casi diariamente del declarante; que las reparaciones ordinarias se hacían sin consultar al testigo pero no se hacía ninguna destrucción de edificio como no fuera un bohío de ninguna importancia sin sometérsele previamente el caso a la consideración del testigo.

El Dr. José Gómez Brioso, Jefe de la División de Enfermedades Trasmisibles del Departamento de Sanidad, declara que todos los sitios combatidos por la peste bubónica estuvieron en Puerta de Tierra desde la parada 6 a la 2½, de ahí a la 3 y de la 3 a la 4; que durante la primera mitad de la epidemia acompañó al oficial de sanidad en casi todas las visitas domiciliarias que hizo; que nunca estuvo en las casas números 21 y 23, aunque conocía el lugar y los ranchones; que en julio de 1912, dichos ranchones estaban en muy malas condiciones sanitarias; que nunca estuvo como tal empleado de sanidad en dichas casas, pues que solo acompañaba al oficial de sanidad a las casas donde había atacados de peste; que en el ejercicio de su profesión como médico había estado en dichos ranchones; que a su juicio dichos ranchones estaban en malas condiciones; que había peligro para una epidemia de peste, porque las casas estaban enclavadas entre las

paradas 3 y 4 que era el foco; que cree que dichos ranchones se hubieran podido tener en condiciones de no ser un peligro para aquella comunidad, reconstruyéndolos; que tal y como estaban podían servir de albergue de ratas; que dentro del período de la epidemia las casas, como estaban, podían constituir un estorbo; que él tiene el sitio antes dicho como muy combatido; que alrededor de los ranchones había casas habitables; que como jefe de todas las enfermedades trasmisibles, todas las noticias de la Isla vienen a su oficina; que el caso de Facundo Costoso fué en la parada 3½, así como también los de Fernando Navaro y Catalino Maldonado; el de Mauricio Sierra en la parada 4 y los de Guillermo Pizarro, Felipe Muñoz y Crecente Iglesias, en la parada 3; que esto ocurrió durante el mes de junio de 1912; que en junio fué la última vez que vió el ranchón; que no fué a dicho ranchón porque hubiese peste en ellos; que no puede recordar cuándo visitó la última vez dichos ranchones, pero cree que antes de la peste, muy poco antes; que como médico trabajaba en dicho barrio; que no recuerda el carácter de la enfermedad del paciente que visitaba allí, pero no fué de gravedad; que no recuerda cuántas veces lo visitó; que como oficial de sanidad nunca se le notificó de que en dichos ranchones hubiera alguna enfermedad contagiosa; que el peligro de la peste bubónica existía en todo el barrio de Puerta de Tierra, como existía en la misma ciudad; que los ranchones pudieron ser aislados para impedir el albergue de ratas, pero cree que la mejor medida era la destrucción de los mismos, pues las condiciones de las casas eran sumamente malas aunque no es perito y sólo habla por impresión; que las ratas se albergan mejor en los edificios viejos cuando el piso está cerca de la tierra y hay alimentación para ellas; que su opinión era que debían destruirse todas las casas que constituyeran un estorbo público; que habla en términos generales; que cuando una casa fuese de un valor grande él era de opinión que se hubiese apelado a otros medios para proteger la sanidad sin necesidad de la destrucción; que todo edificio se puede poner a prueba de

ratas; que la mejor medida honradamente era la destrucción
como el mejor medio de evitar la propagación de la enferme-
dad; que la destrucción es lo mejor, porque la reparación
supone un gasto excesivo; que nunca examinó dicha casa por
dentro; que entró en ella pero no la examinó; que no puede
precisar si el piso estaba junto al suelo; que no puede hablar
del piso sino de la casa en conjunto; que no examinó la casa
en detalles pero sabe que estaba habitada.

El Dr. José S. Belaval, médico de la sanidad en mayo,
junio, julio y agosto de 1912, declara que examinó los ran-
chones del demandante y los encontró en estado ruinoso; que
los examinó durante la peste y se mandaron clausurar antes
de la peste y parte de ellos fué destruída por sus propios
dueños antes de la peste; que los dos ranchones estaban rui-
nosos así como los inodoros; que no recuerda si los pisos esta-
ban malos pero era partidario de la destrucción de los mismos
por estar en muy mal estado; que directamente no puede
decir que hubiera habido peligro por la no destrucción de
esas casas para la comunidad; que hubiera habido el peligro
que hay en todas las casas que no están en estado sanitario;
que estaban ruinosos; que no tiene certeza de si el ranchón
que se destruyó antes de la peste y luego se rehizo pertenece
al demandante porque no ha tenido tiempo de examinar los
archivos, pero recuerda que había en el ranchón que daba a
la calle de San Agustín y contiguo a ese, otro en peor condi-
ción, pero que se refiere a la propiedad en general; que el
mismo estaba en estado poco sanitario; que la apariencia
general era ruinosa, pero no puede dar detalles porque de
esto hace ya año y pico; que tiene idea de que el techo es de
zinc pero no está seguro si era de zinc acanalado o zinc de
planchas cortas; que los setos y las paredes eran de madera
aunque no recuerda con exactitud la apariencia general de
las casas, aunque era ruinosa por estar en estado poco sani-
tario; que en estado poco sanitario significa mal estado de
los inodoros, casa, sucia, pisos en mal estado, techos que se
mojan y paredes malas; que una vez los inodoros de esas

casas fueron arreglados; que el estado general de las casas cuando las destruyeron era más o menos el mismo; que él hizo la inspección durante la peste bubónica; que no podría recordar detalles pero el estado general de esas casas lo recuerda perfectamente y estaban en mal estado, y no recuerda si estaban habitadas cuando fueron destruídas; que era una casa grande de seis u ocho puertas, pero no recuerda las dimensiones exactas y no examinó las maderas; que la casa estaba algo alta del terreno por la parte de atrás, pero por la parte delantera estaba a la altura de la acera aunque el testigo no la midió.

Enrique Peterson, declara que en el mes de julio examinó las dos casas propiedad del demandante y encontró que estaban en malas condiciones; que tenían varios hoyos en el piso por donde el testigo metía las manos para acomodar las ratoneras pequeñas; que algunos de los pisos ajustaban a los setos; que había algunas roturas en la parte de la casa en la calle de San Agustín, junto a la acera; que la parte del frente de la casa que daba junto a la acera y hacia la parte de atrás había varias tablas donde se podían colocar las ratoneras; que en dicha casa se capturaron ratas, aunque pocas, durante la epidemia, por junio o julio; que los setos que no juntaban eran de tablas anchas y sencillas y por tanto las ratas no podían meterse dentro de dichos setos; que había bastantes hoyos en el piso, y aunque no precisa si había hoyos en todas las habitaciones, cree que en la mayor parte los había; que cree que dichos hoyos eran debido a la vejez de la casa; que no sabe si la sanidad mandó a hacer esos hoyos allí para colocar ratoneras; que los techos de las casas estaban mal también, pues el zinc tenía algunas roturas; que del interior podía verse por el techo para afuera; que nunca estuvo en los ranchones en momentos de lluvia y no sabe si caían goteras; que no sabe cuántas ratas se cogieron en los ranchones, pero que diariamente iba a ellos a poner las ratoneras; que en el tiempo en que él iba a los ranchones estaban habitables, pero no había tienda y sí una habitación donde tenían carbón;

que el ranchón estaba algo sucio; que no recuerda lo que vió en la casita separada de la número 23; ni tampoco recuerda las condiciones del edificio donde habían unas maderas.

Francisco Conde, empleado del Departamento de Sanidad, ocupado en la limpieza pública de Puerta de Tierra, declara que le ordenó el Oficial de Sanidad la inspección de todos los patios y en dichos ranchones notó que estaban en mal estado las paredes y los setos, así como el piso; que los setos estaban apolillados y algunas tablas levantadas en la parte de atrás y que extrajo de la habitación de una tal Dolores, mucha basura arrinconada en la casa cuyo seto estaba forrado de una tela impermeable; que el zinc no estaba en buen estado por estar carcomido y varias partes forradas con tela impermeable; que el piso en la parte ocupada por el comerciante Morán, estaba levantado como a un metro y pico de altura, pero en la habitación de la Dolores estaba bajo; que la madera del frente de los ranchones estaba carcomida; que la inspección la hizo el testigo del 19 al 22 de junio cuando la peste; que fué allí a limpiar el corral, pero tuvo que entrar en la casa para extraer basura debajo del piso.

Juan C. Vélez, declara, que conoce los ranchones pues tenía un negocio allí de refresquería, dulces y tabacos; que salió de dicha casa como cuatro meses antes de la peste, y que cuando él tenía el negocio las ratas le comían los cocos y le deterioraban el salchichón; que no puede calcular cuántas ratas había, pero que había también alguna sabandija; que en la parte que él ocupaba el piso tenía grietas, estaba roto y él lo tapaba para evitar que las ratas subieran a robarle lo que tenía; que la parte suya estaba aseada; que los techos le mojaban las provisiones; que no hizo nada para tapar los hoyos para que no se mojaran las provisiones porque él las recogía; que cuando se quejaba a los dueños le contestaban que pintara y arreglara él, pero que como la casa no era suya no hizo nada; que de noche no temía al agua porque lo dejaba todo recogido debajo del mostrador o tapado en cajones de fideos; que tenía los refrescos envasados en botellas y los

salchichones los enganchaba en el aparador y desaparecián por la noche; que durante el tiempo que estuvo allí no se hizo en el piso de su establecimiento ninguna reparación.

Higinio Brillanes, declara que conoce los ranchones; que vivió cuatro años en las habitaciones de los mismos y ocho años en la fonda; que la fonda la tenía en la casita, en el No. 23; que vivió allí hasta cuatro meses antes de la peste y se fué porque la Sanidad le mandó clausurar la casa; que la casa no estaba en buenas condiciones; se mojaba y en los pisos tenía huecos y el seto estaba malo en la parte de atrás; que el demandante puso hormigón en la cocina; que allí había bastantes ratas; que la fonda, después que él se mudó, la mandaron a tumbar, y que antes, cuando él se mudó, metieron maderas en ella.

Emiliano Barrientos, declara, que conoce los ranchones Nos. 21 y 23; que vivió once meses en el número 21 hasta que la sanidad le ordenó mudarse; que el aposento en que él vivía estaba en malas condiciones, pues se mojaba y los setos estaban carcomidos, teniendo los pisos junto a la tierra; que el techo estaba malo con goteras que caían; que había sabandíjas de todas clases, esto es, alacranes, cucarachas, ratones, etc.

Que la prueba de la defensa deja mucho que desear en cuanto a la precisión de sus detalles y seguridad en lo que toca a las afirmaciones de los testigos, cuyo claro deber era conocer los hechos, y quienes debieron haberse expresado en términos categóricos al hacer referencia a los mismos, es un hecho que no puede negarse. Sin embargo, examinada en conjunto la prueba de la defensa, resulta ésta poco favorable para el demandante y no podemos estar de acuerdo con la proposición en que tanto ha insistido el apelante de que los elementos de que carece el caso del demandante tal como ha sido presentado, han quedado subsanados por la prueba presentada por el demandado. Por censurable que sea la incertidumbre o vaguedad en cuanto a los pormenores que debieron haberse precisado de modo terminante dejándose

constancia de los mismos, o haberse conservado de algún modo para referencias futuras, es un hecho razonablemente claro que las casas en cuestión eran viejas, ruinosas, poco susceptibles de ser arregladas, parte de las mismas junto a la tierra, con techos llenos de goteras, paredes carcomidas y pisos podridos e infectados de ratones y sabandijas. Prácticamente no existe absolutamente nada en los autos que se oponga a esta conclusión a la que puede llegarse casi con la misma facilidad considerando la prueba incierta y dudosa del demandante como la del demandado, sin que aparezca nada tampoco que muestre de modo concluyente que de haberse dejado a opción del demandante el destruir los ranchones o ponerlos a prueba de ratas, hubiera elegido este último, o que hubieran podido ponerse en todo caso los referidos ranchones en condiciones sanitarias y a prueba de ratas sin destruirlos completamente, para luego reconstruirlos, teniendo que hacerse un gasto que estuviera fuera de todo cálculo con respecto al verdadero valor de los mismos. En resumen, en la prueba presentada por ambas partes no existe nada donde pueda basarse la conclusión terminante de que la orden del Director de Sanidad hubiera sido injusta o ilegal.

No queremos volver a relatar el hecho de la peste bubónica en Puerto Rico, así como tampoco tenemos necesidad de considerar en toda su extensión las condiciones en que nos encontrábamos en la fecha de su primera aparición. Los hechos históricos están o deben estar frescos en la mente de todo residente reflexivo de la isla. Es humano, sin embargo, el olvidar y dar menos importancia al peligro que ha pasado, y los métodos y medidas que en aquel entonces parecían estar sujetos abiertamente a la más acerba crítica por ser demasiado conservadores y completamente inadecuados ante el peligro inminente pueden, con el transcurso del tiempo, resultar demasiado fuertes y severos y enteramente irrazonables e injustificados a una mente impulsiva e irreflexiva. No debemos perder de vista por un momento cuál era la verdadera situación en la época en que se destruyeron las casas.

del demandante, situación que exigía que se tomara acción rápida y resuelta, habilidad ejecutiva en alto grado, valor moral resuelto, y una gran devoción del deber por parte de los hombres que tenían la responsabilidad de la situación o condiciones que pudiera tomar la epidemia; y examinando toda la prueba a la luz de ese estado de cosas, no vacilamos en declarar que la acción tomada por las autoridades sanitarias de las cuales se queja el demandante, fué como ya hemos indicado, no solamente justa y legal, sino sumamente necesaria y enteramente procedente y digna de elogios. Cualquier otra medida que se hubiera tomado tratándose de edificios viejos, más o menos ruinosos, infectados por las ratas y otras sabandijas, precisamente en el foco de la epidemia, cualquier vacilación, incertidumbre, o demora, o tardanza con tales medidas dilatorias como las órdenes para poner las casas a prueba de ratas y hacer reparaciones con los correspondientes informes de presupuestos, planos, y especificaciones, protestas, *injunctions,* y otros proyectos para perder tiempo en vez de matar ratas, sin mencionar el tiempo exigido para concluir la obra una vez que realmente ha comenzado, equivaldría a una negligencia moralmente criminal del deber oficial, que de seguirse o continuarse en él como regla de conducta general y terminante, sin duda que hubiera resultado en un horrendo y obscuro capítulo de nuestra historia local, en vez de lo que ahora parece a muchos un accidente relativamente insignificante, tan trivial por su naturaleza como pasajero en su duración, y notable solamente debido el costo enorme calculado exclusivamente en dólares y centavos.

No vemos que haya razón alguna para intervenir con la sentencia dictada por la corte inferior, la que debe ser confirmada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, del Toro y Aldrey.